# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3241-16T2

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

E.W.,

    Defendant-Appellant,

and

R.A.,

    Defendant.

_____

IN THE MATTER OF THE GUARDIANSHIP
OF B.W., a Minor.

_____

Argued May 22, 2018 — Decided July 12, 2018

Before Judges Yannotti, Mawla and DeAlmeida.

On appeal from Superior Court of New Jersey,
Chancery Division, Family Part, Hudson County,
Docket No. FG-09-0101-17.

Mary Potter, Designated Counsel, argued the
cause for appellant (Joseph E. Krakora, Public
Defender, attorney; T. Gary Mitchell, Deputy
Public Defender, of counsel and on the briefs;
Joel Marasco, Assistant Deputy Public

Defender, of counsel; Mary Potter, on the briefs).

Julie B. Colonna, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Julie B. Colonna, on the brief).

Noel C. Devlin, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Noel C. Devlin and M. Alexis Pollock, of counsel and on the brief).

PER CURIAM

Defendant E.W. appeals a judgment terminating her parental rights to her daughter B.W. We affirm.

I.

The following facts are taken from the trial record. The Division of Child Protection and Permanency (the Division or DCPP) first became involved with E.W. when she was a minor. At seventeen years old, E.W. began using phencyclidine (PCP), and despite the Division's repeated attempts to assist her, E.W. has never addressed her addiction. From 2005 to 2015, E.W. gave birth to six children, the first when she was nineteen years old. Five of her children tested positive for PCP at birth. E.W.'s first two children are in the care of her sister following entry of a judgment of kinship legal guardianship. E.W.'s parental rights to her remaining four children, including B.W., the child at issue

2

in this appeal, were involuntarily terminated in judicial proceedings initiated by DCPP. During the process of removal of E.W.'s children, the Division repeatedly referred her to substance abuse assessments and treatment programs. She failed to comply with all Division recommendations and treatment referrals. E.W. also experienced periods of psychiatric hospitalization, is homeless, unemployed, and involved in a physically abusive relationship.

B.W. was born in September 2015. She tested positive for PCP at birth, and in the days following, developed withdrawal symptoms including shaking, vomiting, sneezing, and a poor appetite. The child was hospitalized in the intensive care unit for three days. E.W. also tested positive for PCP at B.W.'s birth. Hospital personnel reported the positive test results to DCPP. In addition, DCPP was informed that E.W. had reported to the hospital in August 2015, shortly before B.W.'s birth, believing she was in labor. E.W. tested positive for PCP at that time.

A Division worker went to the hospital to interview E.W. the day after the referral. E.W. was hostile and threatened to punch a hospital social worker for contacting the Division. She denied PCP use, claiming that she tested positive for the drug because she had been around people smoking PCP, but was not using it

A-3241-16T2

herself. When confronted with the August 2015 test results, E.W. could not explain why she was positive for PCP at that time.

E.W. denied that she had mental health issues. She claimed that her psychiatric hospitalizations were due to bad reactions to PCP and not mental illness. She agreed, however, to attend the Mommy and Me Program, and other outpatient services.

E.W. identified R.A. as the father of B.W. E.W. and R.A. had an approximately seven-year relationship with multiple episodes of domestic violence. E.W. obtained three temporary restraining orders against R.A., none of which she pursued to final disposition. E.W. alleged that R.A. fractured her ribs and "busted" her lip. E.W. stated that she was unemployed, survives on monthly disability benefits, and was living on the couch of a relative. She acknowledged having been convicted of aggravated assault, and having served a one-year sentence for that offense.

On September 18, 2015, the Division effectuated a Dodd removal of B.W. from E.W.'s custody.[1] E.W. could identify no relative willing to serve as a caregiver to B.W. The Division contacted the caregivers of B.W.'s siblings, who declined to be considered as a placement resource for the child. B.W. was placed with a

---

[1] A "Dodd removal" refers to the emergency removal of a child from a parent's custody without a court order pursuant to N.J.S.A. 9:6-8.21 to -8.82, known as the Dodd Act. N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011).

resource parent, P.J., who is committed to adopting B.W. The removal was based upon E.W.'s substance abuse, mental health issues, history of domestic violence with R.A., and unstable housing. The Division determined that E.W. was unable to provide stability, protection, and nurturance to B.W. After the removal, DCPP provided E.W. with referrals for substance abuse and mental health treatment, including a substance abuse program at Straight and Narrow. E.W. did not participate in these services.

On September 22, 2015, the Division filed a verified complaint in the Chancery Division pursuant to N.J.S.A. 30:4C-12 against E.W. and R.A. for custody of B.W.[2] On the same day, the trial court continued DCPP's custody of B.W., and her placement in P.J.'s resource home. The court found that B.W.'s emergent removal was appropriate, and that it would be contrary to her welfare to return her to E.W.'s care. The court ordered E.W. and R.A. to comply with substance abuse evaluations and treatment and to undergo psychological evaluations. The parents were granted liberal supervised visitation.

---

[2] The Division also filed a complaint alleging pursuant to N.J.S.A. 9:6-8.21 that E.W. and R.A. abused and neglected B.W. R.A. could not be located or served with the complaint alleging abuse and neglect. On March 15, 2016, the trial court found that E.W. abused and neglected B.W. by failing to remediate her drug abuse, resulting in the child testing positive for PCP at birth. On October 30, 2017, this court affirmed the trial court's decision.

In October 2015, E.W. attended a substance abuse assessment. She acknowledged first using PCP when she was seventeen years old, and that at the time of the assessment she was using the drug daily. Although E.W. claimed to have participated in several drug treatment programs, she could not provide any details of her drug treatment history. She was recommended for the clinically managed high-intensity residential substance abuse program at Straight and Narrow. A Division caseworker gave E.W. referral forms for the program five times. E.W. failed to attend the program.

In November 2015, the Division arranged for weekly supervised visits between E.W. and B.W. E.W. was notified by mail of the visitation schedule, but attended only one visit. In addition, E.W. was referred to a substance abuse assessment to identify treatment options. E.W. failed to attend the assessment. She remained unemployed, homeless, and living with friends.

On November 17, 2015, the trial court heard DCPP's motion to be relieved of its obligation to make reasonable efforts to reunite E.W. and B.W. under N.J.S.A. 30:4C-11.3(c) because E.W.'s parental rights to her other children had been terminated. E.W. tested positive for PCP in a test administered on the date of the hearing.

On January 4, 2016, the trial court granted the motion. E.W.'s motion for reconsideration was denied on February 10, 2016.

Despite having been relieved of its statutory obligation to make reasonable efforts at reunification, DCPP continued to provide services to E.W. The Division assisted E.W. with seeking public assistance, referred her to therapeutic visitation through Catholic Charities, and arranged an appointment to have a psychological evaluation with Dr. Karen Wells. Dr. Wells had evaluated E.W. in 2014, during E.W.'s incarceration at the Mercer County jail on an assault charge. The Division gave E.W. bus passes to provide transportation to various services. E.W. failed to attend any of these services or to see Dr. Wells.

In January 2016, E.W. began weekly supervised visits with B.W. at the Urban League. The visits terminated in February after E.W. missed two consecutive visits. The Division referred E.W. for therapeutic supervised visitation, but she failed to contact the Division to initiate those visits. E.W. did not visit B.W. from February 16, 2016 through June 2016.

Prior to a February 4, 2016 court hearing, E.W. claimed that she had not been using drugs and agreed to submit to a urine screen, to comply with a substance abuse assessment, participate in mental health counseling, and undergo a psychological evaluation by Dr. Wells. She later refused to attend the drug screen because her tooth was hurting, and failed to attend several scheduled substance abuse assessment appointments. The Division

gave E.W. contact information for mental health services at a local hospital. She did not enroll in those services.

Despite being informed of and agreeing to a March 17, 2016 psychological evaluation by Dr. Wells, E.W. failed to attend. She also failed to attend three rescheduled dates for the evaluation. Because E.W. did not participate in an evaluation, Dr. Wells was unable to update the report she completed in September 2014.

On March 31, 2016, the court approved the Division's permanency plan to terminate E.W.'s parental rights, followed by adoption of B.W. by her resource parent. The court found that it was unsafe to return B.W. to E.W. because E.W. failed to complete substance abuse treatment or comply with the services recommended by DCPP. The court determined that the Division provided reasonable efforts to reunite E.W. and B.W., including visitations with the child, exploring relatives for placement of B.W., drug abuse assessment and treatment options, family team meetings, psychological evaluation appointments, and mental health counseling. E.W. failed to take advantage of any of those reunification efforts.

In June 2016, the Division referred E.W. for therapeutic supervised visitation with Catholic Charities. After missing several intake appointments, E.W.'s visits with B.W. began in August. Catholic Charities terminated E.W.'s visitation after the

second visit because she became irate and threatened staff when she arrived late for a visit. She did not contact the Division to arrange for visits with B.W. for the remainder of the guardianship action.

On July 11, 2016, DCPP filed for guardianship of B.W. At an August 18, 2016 hearing, E.W. did not appear, but was represented by counsel. The court ordered her to attend psychological and bonding evaluations, and a substance abuse assessment. The court granted E.W. weekly supervised visitation with B.W.

On July 21, 2016, E.W. submitted to a drug screen. She tested positive for PCP. She agreed to attend a substance abuse assessment. Although the Division provided E.W. with a bus pass, she failed to appear for the assessment.

In August 2016, the Division provided E.W. with resources for welfare benefits, shelters, and food pantries. A Division social worker offered to assist E.W. in identifying an appropriate mental health program. On August 10, 2016, E.W. was handed information concerning Project Home, which provides wraparound services, including housing, and mental health and substance abuse treatment for women and their children. E.W. did not contact the program.

On October 3, 2016, Dr. Wells conducted a bonding evaluation between P.J., the resource parent, and then-one-year-old B.W. Dr. Wells concluded to a reasonable degree of psychological certainty

that B.W. was securely bonded to the resource parent and viewed her as her psychological parent.

On October 13, 2016, the court ordered E.W. to comply with the previously offered services, as well as therapeutic visitation with B.W. E.W. did not comply with the court's order. The trial court drew a negative inference from E.W.'s refusal to comply with an instant drug screen.

On November 2, 2016, the court again ordered E.W. to comply with services, including counseling and therapy. E.W. did not comply with the court's order. In November 2016, DCPP offered E.W. assistance with contacting mental health service providers because she had not engaged in any mental health treatment, but she did not show up for her appointment at the Division. E.W. submitted to a substance abuse evaluation, and tested positive for PCP. She was then recommended for intensive outpatient drug treatment. She failed to attend the program.

Because E.W. had not visited B.W. since August 2016, the Division attempted to arrange for a parent mentor for E.W. That effort was unsuccessful because of E.W.'s lack of participation.

On January 20, 2017, ten days before the scheduled start of the guardianship trial, E.W. moved for a postponement based on various constitutional arguments, including that the court should not order a termination of her parental rights absent proof beyond

a reasonable doubt that such relief is warranted. E.W. also requested additional time to comply with services. The court rejected one legal argument raised by E.W., reserved decision on the remainder, and denied E.W.'s motion to postpone the trial.

The guardianship trial occurred over the course of three days in January and March 2017. DCPP presented documentary evidence, and testimony from Dr. Wells, who was accepted as an expert in psychology, Elizabeth Rosa, a Division adoption caseworker, and B.W.'s resource parent. E.W. did not call witnesses. B.W.'s law guardian supported termination of E.W.'s parental rights.

Dr. Wells testified with respect to her September 2014 psychological evaluation of E.W., as well as her opinion regarding E.W.'s current parental capacity. Dr. Wells testified that E.W. posed a risk to B.W. because she had not addressed her addiction to PCP, or her mental health issues, and had not stabilized her housing or employment. The doctor testified that E.W.'s use of PCP was likely to impair her parenting judgment and aggravated what likely was E.W.'s undiagnosed bipolar disorder. Dr. Wells opined that E.W.'s prognosis for overcoming drug addiction was poor, chiefly because she does not view her use of PCP as a problem. E.W. told Dr. Wells that she enjoys using the drug.

Dr. Wells also opined to a reasonable degree of psychological certainty that, in light of their limited interaction since B.W.'s

A-3241-16T2

birth, the child would not incur harm if E.W.'s parental rights were severed. She opined that B.W. would experience severe and enduring harm if she were to be removed from P.J.'s care, and would regress behaviorally because she had bonded to her resource parent. Dr. Wells acknowledged that due to B.W.'s age, she would be capable of bonding to another caretaker, but added that E.W. was not suitable as a caretaker for B.W.

P.J. testified that she was committed to adopting B.W. Since she was given custody of B.W., she had allowed and facilitated contact between E.W. and B.W. by permitting E.W. to call for updates on the child, attend B.W.'s doctor's appointments, and participate when B.W.'s ears were pierced. However, P.J. testified that E.W. began behaving inappropriately and threatening her. As a result, by November 2015, P.J. no longer permitted E.W. to have contact with B.W. in the resource home.

On March 16, 2017, Judge Bernadette N. DeCastro issued a detailed written decision rejecting the other legal issues raised in E.W.'s pretrial motions, and concluding that the Division proved, by clear and convincing evidence, the statutory prongs for termination of E.W.'s parental rights. The court issued a separate written opinion rejecting E.W.'s argument that application of the clear and convincing evidence standard violated her constitutional rights to due process and equal protection. The court entered a

judgment terminating E.W.'s parental rights to B.W. This appeal followed. B.W.'s law guardian supports the trial court's judgment.[3]

## II.

Our scope of review on appeal from an order terminating parental rights is limited. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). We will uphold a trial judge's factfindings if they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014) (citing N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). No deference is given to the court's "interpretation of the law" which is reviewed de novo. D.W. v. R.W., 212 N.J. 232, 245-46 (2012) (citing N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 183 (2010); Balsamides v. Protameen Chems., 160 N.J. 352, 372 (1999)).

"We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses

---

[3] R.A. appeared telephonically on October 16, 2016, for a hearing. He acknowledged service of the guardianship complaint and was assigned counsel. He did not appear at any other court hearing, including the trial, and denied paternity of B.W. R.A. did not appear for scheduled paternity tests. The court terminated R.A.'s parental rights to B.W. on March 16, 2017. He did not appeal.

special expertise in matters related to the family." <u>N.J. Div. of Youth & Family Servs. v. F.M.</u>, 211 N.J. 420, 448 (2014) (citing <u>Cesare v. Cesare</u>, 154 N.J. 394, 413 (1998)). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." <u>E.P.</u>, 196 N.J. at 104 (quoting <u>G.L.</u>, 191 N.J. at 605). We also accord deference to the judge's credibility determinations "based upon his or her opportunity to see and hear the witnesses." <u>N.J. Div. of Youth & Family Servs. v. R.L.</u>, 388 N.J. Super. 81, 88 (App. Div. 2006) (citing <u>Cesare</u>, 154 N.J. at 411-13).

When terminating parental rights, the court focuses on the "best interests of the child standard" and may grant a petition when the four prongs set forth in N.J.S.A. 30:4C-15.1(a) are established by clear and convincing evidence. <u>In re Guardianship of K.H.O.</u>, 161 N.J. 337, 347-48 (1999). "The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." <u>Id.</u> at 348.

N.J.S.A. 30:4C-15.1(a) requires the Division to prove:

> (1) The child's safety, health, or development has been or will continue to

be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

A.

Before addressing the trial court's findings under the statutory factors, we consider E.W.'s contention that this court should depart from longstanding precedents and require the Division to prove each element of the statutory best interests of the child test beyond a reasonable doubt. E.W. contends that application of the clear and convincing evidence standard, which has been used in parental rights termination matters in this State for decades, violates her due process rights. In addition, E.W. argues that application of the clear and convincing evidence standard violates her right to equal protection because the Indian

15                                              A-3241-16T2

Child Welfare Act (ICWA), 25 U.S.C. §§ 1901-1963, requires that a state court apply the beyond a reasonable doubt standard to the termination of parent rights to Indian children. B.W. is not Indian. Thus, E.W. argues, she is being denied the greater protection afforded under the ICWA because of her child's race. We find E.W.'s arguments to lack legal support.

In Santosky v. Kramer, 455 U.S. 745, 747-48 (1982), the United States Supreme Court held that "[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." The Court held that the clear and convincing evidence standard "adequately conveys to the factfinder the level of subjective certainty about his [or her] factual conclusions necessary to satisfy due process." Id. at 769. While a State is free to apply a stricter evidentiary standard, the "determination of the precise burden equal to or greater than that standard is a matter of state law properly left to state legislatures and state courts." Id. at 770.

Four years later, our Supreme Court cited Santosky when discussing the burden of proof applicable to parental termination claims:

> As to the burden of proof, in Santosky v.
> Kramer, . . . the United States Supreme Court
> held that the Fourteenth Amendment requires

A-3241-16T2

application of at least a "clear and convincing" standard of proof to a state's parental-rights-termination proceeding. In reaching this conclusion, the Court noted its historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment.

[N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 611-12 (1986) (citations omitted).]

For proceedings in this State, the Court held, "[t]he correct standard is 'clear and convincing' proof. It is the standard that our courts have followed." Id. at 612 (citing In re Guardianship of R., 155 N.J. Super. 186, 193 (App. Div. 1977) ("Division has the burden of establishing [the] grounds for termination of parental rights by clear and convincing evidence.")).

Since the holding in A.W. more than thirty years ago, the Court has not altered its unequivocal holding. Nor has the legislature changed the standard of proof, either when it codified the best interests of the child test, L. 1991, c. 275, § 7, or at any time in the decades that followed. We are, therefore, bound by the Supreme Court's holding in A.W. applying the clear and convincing evidence standard to the Division's proofs. Lake Valley Assocs., LLC v. Twp. of Pemberton, 411 N.J. Super. 501, 507 (App. Div. 2010) ("Because we are an intermediate appellate court, we

are bound to follow the law as it has been expressed by a majority of the members of our Supreme Court.").

Only the Supreme Court can decide whether to depart from its holding in A.W. We do not, therefore, express an opinion on the numerous arguments raised by E.W. advocating the position that the beyond a reasonable doubt standard is appropriate for termination of parental rights claims.

Nor do we find merit in E.W.'s argument that application of the clear and convincing evidence standard to the Division's application to terminate her parental rights deprives her of equal protection. The ICWA was enacted pursuant to the Congress's constitutional authority to regulate commerce with Indian tribes, U.S. Const. art. I, § 8, cl. 3, to address "an alarmingly high percentage of Indian families . . . broken up by the removal, often unwarranted, of their children" by nontribal agencies. 25 U.S.C. §§ 1901 (1) and (4). When enacting the statute, Congress found that

> it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families . . . .

> [25 U.S.C. § 1902.]

The Act provides that in state court proceedings involving termination of parental rights to an Indian child, the state court, in the absence of good cause to the contrary, shall transfer such proceeding to the appropriate tribal court, unless either parent objects. 25 U.S.C. § 1911(b). A tribal court may decline to accept the transfer. <u>Ibid.</u> In those instances in which a state court retains jurisdiction,

> [n]o termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.
>
> [25 U.S.C. § 1912(f).]

We begin our analysis of E.W.'s argument with the observation that the ICWA was enacted in 1978, prior to the holdings in <u>Santosky</u> and <u>A.W.</u> The Court in <u>Santosky</u>, after surveying the varying evidentiary standard applied in the states, noted that the "only analogous federal statute of which we are aware permits termination of parental rights solely upon 'evidence beyond a reasonable doubt.'" 455 U.S. at 749-50 (citing ICWA). The Court addressed the statute when it explained the rationale for not mandating a beyond a reasonable doubt standard:

> [a]lthough Congress found a "beyond a reasonable doubt" standard proper in one type

of parental rights termination case, another legislative body might well conclude that a reasonable-doubt standard would erect an unreasonable barrier to state efforts to free permanently neglected children for adoption.

[Santosky, 455 U.S. at 769.]

The Santosky Court clearly was aware of the higher standard applicable to the termination of parental rights to Indian children when it held that the Constitution permitted application of the clear and convincing evidence standard to the parents of non-Indian children in those states that decide to apply the lower standard. This rationale was, in effect, adopted by our Supreme Court in A.W., when after the opinion in Santosky was issued, unequivocally held that the proper standard in our State is clear and convincing evidence.

Moreover, there is ample precedent establishing the constitutionality of the ICWA in the face of an equal protection challenge. As the Oregon Court of Appeals succinctly held when rejecting a constitutional challenge to the statute, "[t]he United States Supreme Court has consistently rejected claims that laws that treat Indians as a distinct class violate equal protection. Traditional equal protection analysis cannot be applied." In re Angus, 655 P.2d 208, 213 (Or. App. 1983) (citing Washington v. Confederated Bands and Tribes of the Yakima Indian Nation, 439 U.S. 463 (1979), Delaware Tribal Bus. Comm. v. Weeks, 430 U.S. 73

20

(1977), <u>United State v. Antelope</u>, 430 U.S. 641 (1977), <u>Fisher v. Dist. Court</u>, 424 U.S. 382 (1976), <u>Morton v. Mancari</u>, 417 U.S. 535 (1974)). In <u>Morton</u>, the Court held:

> [l]iterally every piece of legislation dealing with Indian tribes and reservations, and certainly all legislation dealing with the [Bureau of Indian Affairs], single out for special treatment a constituency of tribal Indians living on or near reservations. If these laws, derived from historical relationships and explicitly designed to help only Indians, were deemed invidious racial discrimination, an entire Title of the United States Code (25 USC) would be effectively erased and the solemn commitment of the Government toward the Indians would be jeopardized.
>
> [417 U.S. at 552.]

In upholding a law granting Indians a hiring preference, the <u>Morton</u> Court held that "[t]he preference, as applied is granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities . . . ." <u>Id.</u> at 554. "As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed." <u>Id.</u> at 555.

The <u>Angus</u> court, after reviewing these precedents held the "protection of the integrity of Indian families to be a permissible goal that is rationally tied to the fulfillment of Congress' unique guardianship obligation toward the Indians and that the ICWA is

21

therefore not unconstitutional." 655 P.2d at 213 (footnote omitted). We agree. E.W. has not established an equal protection violation.

B.

E.W. argued that the trial court erred in its findings on the four prongs set forth in N.J.S.A. 30:4C-15.1(a). After reviewing these arguments in light of the record and applicable legal principles, we are convinced there is substantial credible evidence supporting the trial judge's findings of fact and legal conclusion that it was in B.W.'s best interests to terminate E.W.'s parental rights. We address the four statutory prongs in turn.

1.  Prong One.

The first prong of the best interests of the child standard requires the Division to establish that "[t]he child's safety, health, or development has been or will continue to be endangered by the parental relationship[.]" N.J.S.A. 30:4C-15.1(a)(1). "[T]he Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Div. of Youth & Family Servs. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352).

The harm need not be physical, as "[s]erious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute

22

injury sufficient to authorize a termination of parental rights."
In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992) (citing In
re Guardianship of J.C., 129 N.J. 1, 18 (1992)).  The focus of the
harm is not on any isolated incident, but rather "the focus is on
the effect of harms arising from the parent-child relationship
over time on the child's health and development."  K.H.O., 161
N.J. at 348.  "Moreover, '[c]ourts need not wait to act until a
child is actually irreparably harmed by parental inattention or
neglect.'"  Div. of Child Prot. & Perm. v. E.D.-O., 223 N.J. 166,
178 (2015) (alteration in original) (quoting In re Guardianship
of DMH, 161 N.J. 365, 383 (1999)).

The harm may be established by "a delay in establishing a
stable and permanent home . . . ."  DMH, 161 N.J. at 383.  "A
parent's withdrawal of . . . solicitude, nurture, and care for an
extended period of time is in itself a harm that endangers the
health and development of the child."  Id. at 379 (citing K.H.O.,
161 N.J. at 352-54).  Additionally, a parent's "persistent failure
to perform any parenting functions and to provide . . . support
for [the child] . . . constitutes a parental harm to that child
arising out of the parental relationship [that is] cognizable
under N.J.S.A. 30:4C-15.1(a)(1) and (2)."  Id. at 380.

E.W. argues that the Division presented no evidence that B.W.
suffered harm caused by E.W.  Although apparently conceding that

23

B.W. tested positive for PCP at birth due to her mother's ingestion of the drug, E.W. argues that the Division relied on hearsay evidence to establish that B.W. suffered withdrawal symptoms from the PCP exposure. In addition, E.W. argues that the record contains no evidence B.W. suffered any lasting medical harm as a result of her mother's drug use while pregnant with the child.

The judge concluded the first prong was established because the child was harmed by E.W.'s inability to provide a safe and stable home for any of her children since 2006, her failure to address her significant and longstanding drug addiction, and the deterioration in her behavior caused by her drug abuse. The court based her finding on the last point on E.W.'s erratic behavior and the threats that she made to a Division caseworker. The court also noted that because of E.W.'s drug use, B.W. has spent nearly her entire life in foster care, which is itself a harm to the child. In addition, relying on the expert opinion of Dr. Wells, the court concluded that E.W.'s continued drug use and possible undiagnosed bipolar disorder harmed B.W. by depriving her of stability and nurture from E.W.

We agree. The record clearly and convincingly demonstrates that B.W. tested positive for PCP at birth, and that E.W. tested positive for PCP in August 2015 while pregnant with B.W. The record shows that the exposure of B.W. to PCP harmed the child.

24

There is substantial evidence showing that the child spent the earliest days of her life in withdrawal. However, the judge's findings on prong one were not based solely on the child's exposure to the drug. The record also supports the trial court's determination that E.W.'s drug use, and failure to provide a stable, nurturing, and secure home for B.W. caused the child harm for the duration of her life.

E.W. took no steps to address her addiction to PCP, which has been present her entire adult life. She did not visit the child with any regularity, depriving her of love, nurture, and emotional support. She did not arrange for stable housing for the child. Nor did she secure employment to provide financially for B.W. In effect, E.W. abandoned her child shortly after B.W. was born.

Accordingly, there was substantial credible evidence in the record to support the trial judge's finding E.W. endangered B.W.'s safety, health, or development, and that the child would continue to be endangered by E.W.'s actions.

2.   Prong Two.

"The second prong, in many ways, addresses considerations touched on in prong one." F.M., 211 N.J. at 451. The focus is on parental unfitness. K.H.O., 161 N.J. at 352; DMH, 161 N.J. at 378-79. In considering this prong, the court should determine whether it is reasonably foreseeable that the parent can cease to

inflict harm upon the child.  A.W., 103 N.J. at 607.  The second prong may be satisfied

> by indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, the inability to provide a stable and protective home, the withholding of parental attention and care, and the diversion of family resources in order to support a drug habit, with the resultant neglect and lack of nurture for the child.
>
> [K.H.O., 161 N.J. at 353.]

"Prong two may also be satisfied if 'the child will suffer substantially from a lack of . . . a permanent placement and from the disruption of [the] bond with foster parents.'"  F.M., 211 N.J. at 451 (alteration in original) (quoting K.H.O., 161 N.J. at 363).

The trial judge found that E.W. is unwilling or unable to correct the harms that resulted in B.W.'s removal from her custody. The court noted that E.W. had demonstrated no improvement from the time that Dr. Wells evaluated her in 2014.  She continued to abuse PCP.  E.W. had not secured stable housing or employment.  She remained in a physically abusive relationship with the man she identified as B.W.'s father.  The court concluded that E.W. was unable to provide a safe and stable home for B.W. in the foreseeable future.  The judge also concluded that any further delay in permanency for B.W. would add to the child's harm.

In addition, the trial court, relying on the bonding evaluation conducted by Dr. Wells of B.W. and P.J., concluded that the child was securely bonded to P.J., who was affectionate and attentive to the child. The court concluded that B.W. views P.J. as her psychological parent. While the court recognized that B.W. might form a bond with a new caregiver, the judge concluded that to do so, the new caregiver would have to capable of parenting effectively. The court concluded that E.W. was not in a position to be an effective and appropriate caregiver to B.W. Thus, the court concluded, severing the bond between B.W. and P.J. would be detrimental to the child. For these reasons, the trial court concluded that the second prong of the best interests test was met.

Our review of the record lead us to conclude that there is sufficient credible evidence supporting the trial court's conclusion that the Division satisfied the second prong of the best interests of the child test by clear and convincing evidence.

3. <u>Prong Three.</u>

Under prong three, the trial court must consider whether "the [D]ivision . . . made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home . . . ." N.J.S.A. 30:4C-15.1(a)(3). The Division's efforts must be analyzed "with reference to the

27                                                  <span>A-3241-16T2</span>

circumstances of the individual case[,]" including the parent's degree of participation. DMH, 161 N.J. at 390.

N.J.S.A. 30:4C-15.1(c) defines reasonable efforts as those reasonable "attempts by an agency authorized by the [D]ivision to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure[.]" The statute sets forth examples of "reasonable attempts," including but not limited to:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
>
> (3) informing the parent at appropriate intervals of the child's progress, development, and health; and
>
> (4) facilitating appropriate visitation.
>
> [Ibid.]

E.W. argues the Division failed to prove its reasonable efforts to reunify her with B.W. According to E.W., the Division merely gave E.W. information about drug abuse assessment evaluations, and treatment options, and offered to meet with her only once to assist E.W. to make phone calls to treatment programs. E.W. does not identify what further steps she believes DCPP should have taken, except to argue that E.W.'s caseworker could have

traveled to E.W.'s home to try to convince her to enroll in a drug treatment program. In addition, E.W. argues that the trial court should have given her additional time to address her PCP addiction.

The trial court, relying on the extensive attempts by the Division to engage E.W. in meaningful substance abuse treatment, and E.W.'s persistent refusal to enroll in a treatment program, found that the Division produced clear and convincing evidence that it satisfied the third prong of the best interests of the child test. In addition, the court found that E.W. was not likely to resolve her substance abuse issue in the near future.

Our review of the record lead us to conclude that substantial credible evidence supports the trial court's determination with respect to the Division's reasonable efforts to avoid termination of E.W.'s parental rights.[4] Also, nothing in the record suggests that E.W. would be in a position to be a suitable parent to B.W. were she given additional time to address her drug addiction.

4. Prong Four.

The fourth prong of the best interests of the child test requires the Division to show "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4).

---

[4] As noted above, although the trial court relieved the Division of its obligation to make reasonable efforts at reunification, the agency continued to make such efforts up to the date of trial.

Termination of parental rights poses a risk to children due to the severing of the relationship with their natural parent, but it is based "'on the paramount need the children have for permanent and defined parent-child relationships.'"  K.H.O., 161 N.J. at 355 (quoting J.C., 129 N.J. at 26).

Thus, "the fourth prong of the best interests standard [does not] require a showing that no harm will befall the child as a result of the severing of biological ties."  K.H.O., 161 N.J. at 355.  Prong four "serves as a fail-safe against termination even where the remaining standards have been met."  G.L., 191 N.J. at 609.  "[T]he question to be addressed under [prong four] is whether, after considering and balancing the two relationships, the child[ren] will suffer a greater harm from the termination of ties with [their] natural parents than from permanent disruption of [their] relationship with [their] foster parents."  I.S., 202 N.J. at 181 (quoting J.N.H., 172 N.J. at 478).

Generally, to prove the fourth prong, the Division "'should offer testimony of a well qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents.'"  F.M., 211 N.J. at 453 (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007)); See R.G., 217 N.J. at 564 (finding the Division's position

lacked support because "no bonding evaluation was conducted");
N.J. Div. of Youth & Family Servs. v. A.R., 405 N.J. Super. 418,
432 (App. Div. 2009) (affirming an order denying the termination
of parental rights in cases where no bonding evaluation was
conducted). The lack of a bonding evaluation is not fatal where
termination "was not predicated upon bonding, but rather reflected
[the child's] need for permanency and [the parent's] inability to
care for him in the foreseeable future." N.J. Div. of Youth &
Family Servs. v. B.G.S., 291 N.J. Super. 582, 593 (App. Div. 1996).

Here, the trial court relied on the expert testimony of Dr.
Wells regarding the strong bond that developed between B.W. and
her resource parent who is committed to adopting her. B.W.
considers P.J. to be her parent. Dr. Wells testified that
termination of that bond would harm B.W. While B.W. is young
enough to form a new parental bond with an appropriate caregiver,
Dr. Wells opined E.W. is not likely to be a reasonable caregiver
for B.W. at any point in the foreseeable future. The trial court
found this opinion to be credible, and concluded that terminating
the bond between B.W and P.J. would cause "acute" harm to the
child.

E.W. offered no conflicting expert testimony, and did not
appear for an evaluation of her bond with B.W., an infant who she
did not visit for many months before the trial, leaving the

testimony of Dr. Wells, in the words of the trial court, "uncontroverted." The expert testimony provides substantial credible evidence for the trial court's conclusion that the Division established the fourth prong of the best interests of the child test by clear and convincing evidence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3241-16T2